KENNETH E. MAYOL, Plaintiff-Appellee and Counterdefendant, v. SUMMERS, WATSON AND KIMPEL *et al.*, Defendants-Appellants (Richard Watson, Defendant; Raymond R. Kimpel, Counterplaintiff).

Fourth District   No. 4—90—0697

Opinion filed January 16, 1992.—Rehearing denied February 26, 1992.

Raymond R. Kimpel, of Champaign, *pro se*, for appellants.

David A. Dvorak, of Reardon, Orr & Dvorak, Ltd., of East Peoria, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiff, Kenneth E. Mayol, sued defendants Philip Summers and Raymond H. Kimpel (in their individual capacities) and Summers, Watson & Kimpel (a partnership) seeking damages for legal malpractice. Defendant Kimpel counterclaimed for fees Mayol allegedly owed him for prosecuting an appeal on behalf of Mayol. A jury returned a verdict in favor of Mayol on his legal malpractice claim, awarded damages of $700,000, and also returned a verdict in favor of Mayol on Kimpel's counterclaim. On appeal, defendants challenge the sufficiency of the evidence to support the jury's verdict and the damages award. Alternatively, they contend that various errors in the admission of evidence and in the jury instructions entitle them to a new trial. We disagree and affirm.

## I. Facts

Mayol retained Kimpel, a member of the law firm of Summers, Watson & Kimpel, to represent him in an action for malpractice against two chiropractors, Dr. Frank Forman and Dr. Joseph P. Hanoka. Following entry of summary judgment in favor of the two chiropractors and affirmance of that judgment on appeal, Mayol brought the present legal malpractice action against defendants. Because defendants challenge the sufficiency of the evidence, we provide a somewhat detailed summary of the evidence presented at trial. In doing so, we will emphasize evidence favorable to Mayol that, if believed by the jury, was sufficient to support its verdict. See *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11, 445 N.E.2d 39, 42.

### A. *Chiropractic Malpractice Action*

On June 23, 1984, defendant Kimpel, acting on Mayol's behalf, filed a chiropractic malpractice suit against Drs. Forman and Hanoka, as well as against Forman Clinic, P.C. The complaint consisted of four counts, one of which the trial court dismissed on the pleadings.

On March 13, 1986, Dr. Forman filed a motion for summary judgment, supported by an affidavit, as to the remaining counts directed against him and Forman Clinic, P.C. On March 25, 1986, Dr. Hanoka also filed a motion for summary judgment, also supported by an affidavit, as to the remaining count directed against him. Kimpel subsequently filed Mayol's affidavit in opposition to the summary judgment motions of Drs. Forman and Hanoka.

On April 30, 1986, the court allowed plaintiff's motion for a continuance of the hearing on the motions for summary judgment. Kimpel sought the continuance because he was scheduled to appear at a pretrial conference in Federal court on the same day the hearing on the motion for summary judgment was set.

On June 4, 1986, an additional affidavit of Mayol was filed in opposition to the chiropractors' motions for summary judgment. The trial court held a hearing on the summary judgment motions on the same day.

In a letter opinion filed June 17, 1986, the court granted the summary judgment motions of the chiropractors. The court noted that plaintiff had filed no medical affidavits in opposition to the affidavits of the chiropractors. The court held that without an expert opinion supporting plaintiff's complaint, the applicable standard of care could not be determined, and that this alone provided a sufficient basis for granting the motions for summary judgment. This court subsequently affirmed the trial court's summary judgment order. See *Mayol v. Forman Clinic, P.C.* (1986), 149 Ill. App. 3d 1165, 514 N.E.2d 610 (unpublished order under Supreme Court Rule 23).

## B. *Pleadings in Present Litigation*

On March 16, 1988, Mayol sued defendants for legal malpractice, alleging that sometime prior to May 23, 1984, Kimpel agreed on behalf of himself and his law firm to represent Mayol in his claims against Drs. Forman and Hanoka for chiropractic malpractice. Mayol alleged that in the course of defendants' representation of him, they committed the following negligent acts or omissions:

"(a) Failed to possess the knowledge and apply the skill, care, expertise and diligence that a reasonably well-qualified lawyer practicing in the same field would have employed under like circumstances;

(b) Failed to timely associate with an attorney who possessed sufficient knowledge and skill to handle plaintiffs [*sic*] malpractice case when they knew or should have known they did not possess sufficient knowledge and skill themselves;

(c) Failed to timely obtain or offer expert testimony in opposition to the motions for summary judgment and affidavits filed by the defendant chiropractors;

(d) Failed to obtain or file the deposition of the neurosurgeon who treated Plaintiff after the chiropractic malpractice or any other medical expert in opposition to the motion[s] for summary judgment and affidavits of the chiropractor defendants;

(e) Failed to offer or establish by expert testimony the standard of chiropractic care and any deviation from the standard of chiropractic care by the Defendants in that case.

(f) Failed to depose either of the Defendants;

(g) Failed to test the sufficiency of the affidavits filed by the Defendants in support of their motions for summary judgment by objecting to and moving to strike those affidavits in the trial court when he [(Kimpel)] knew, or should have known, that the sufficiency of the Defendants' affidavits could not be tested for the first time on appeal;

(h) Failed to prepare and file an affidavit under Supreme Court Rule 191 and seek such further continuances of the hearing on Defendants' motions for summary judgment as was necessary in order to enable the retention of a qualified expert witness;

(i) Failed to timely plead [an] assault and battery action against the Defendant chiropractors in the trial court;

(j) Failed to timely file a Petition for Leave to Appeal to the Illinois Supreme Court after the adverse decision of the Appellate Court of the Fourth District of the State of Illinois on the appeal from the summary judgments in the trial court;

(k) Falsely represented to the Plaintiff that he [(Kimpel)] had filed a Petition for Leave to Appeal to the Illinois Supreme Court from the adverse decision of the Appellate Court of the Fourth District of Illinois."

Mayol alleged that as a direct and proximate result of one or more of these acts or omissions, the trial court granted summary judgment for the chiropractors, and his malpractice case against them was lost. Mayol further alleged that had defendants exercised ordinary care in representing him, it is reasonably likely that he would have recovered substantial monetary damages as a result of his chiropractic malpractice claims.

In an answer filed November 23, 1988, defendants denied the crucial allegations of Mayol's complaint. On the same date, defendants

filed a counterclaim against Mayol requesting fees for their appeal of the summary judgments entered in favor of the chiropractors.

On October 19, 1989, the trial court permitted Mayol to file, over defendants' objections, a second count of his legal malpractice complaint against defendants. In this count, Mayol alleged that various omissions on the part of defendants were "willful, wanton or reckless acts or omissions" committed "with utter indifference to or conscious disregard for the consequences." The court denied a motion to dismiss this new count on November 16, 1989, and defendants subsequently answered it.

On February 9, 1990, defendants filed affirmative defenses to Mayol's claims. Defendants asserted that Mayol was guilty of comparative negligence in that (1) he negligently failed to cooperate with defendants in obtaining expert witnesses, (2) he negligently and carelessly failed to authorize defendants to file a motion for voluntary dismissal of the chiropractic malpractice suit, (3) he refused to submit himself for examination by expert witnesses suggested by defendants and refused to allow defendants to send his medical records to these experts for evaluation, and (4) he "refused to follow the advice of his attorneys or to cooperate with them *** and took over the direction and management of his own case and directed his attorneys at that time in opposition to their wishes and advice and asserted his right to direct the litigation." On the same day, defendants filed an "AFFIRMATIVE DEFENSE OF COMPARATIVE WILLFUL AND WANTON NEGLIGENCE" based on the same factual allegations as their affirmative defenses asserting Mayol was guilty of comparative ordinary negligence.

## C. *Evidence of Chiropractic Malpractice*

At a jury trial held between July 18 and 27, 1990, Mayol, an accountant, testified that Drs. Forman and Hanoka treated him for back problems between May 12, 1982, and September 1, 1982. Prior to their treatment of him, he had periodically experienced problems with his back, but his condition always improved with chiropractic treatment. During the course of his treatment by Dr. Forman, Mayol's back problem did not improve; instead, his condition became increasingly worse. By July 1982, Mayol was not able to get to his accounting office more than one day per week on average. At this point, Mayol could not endure lying in a bed, even though he had purchased a new mattress on Dr. Forman's recommendation and spent lengthy periods of time lying on the basement floor of his home.

Mayol testified that Dr. Forman last treated him on August 21, 1982. After manipulation treatments on that day, Mayol experienced a "deeper pain" in his back, as well as in both of his thighs.

After being treated for the last time by Dr. Forman, Mayol made an appointment with Dr. Hanoka, who first treated him on August 23, 1982. Mayol testified that after taking X rays, Dr. Hanoka told him, " '[Y]ou ought to be in the hospital, but I'll try to treat you for about 10 days.' " Dr. Hanoka told Mayol that if he did not see any signs of improvement, he would admit Mayol to the hospital.

Mayol testified that between August 23 and September 1, 1982, Dr. Hanoka's treatments brought him some relief from the pain. On September 1, 1982, Dr. Hanoka performed traction and manipulation treatment on Mayol. According to Mayol, Dr. Hanoka then said, " '[L]et's see how flexible you are.' " Thereafter,

> "[Dr. Hanoka] brought my knees up toward my chest as far as he could get them without a lot of pain, he put his forearm across my knees and pressed down like this. When he did that, I let out a scream. I don't know whether I cursed or what at that time. What I felt was like a red hot fire place poker laying on the back of my left thigh, a hot sensation and a lot of pain in my back radiated down my left thigh. At that time I couldn't feel anything from my waist down as far as feeling to touch. I could feel the hotness in my left thigh, but as soon as that was over, I had no feeling below my waist."

Mayol testified that after this, he could not stand. Eventually, he was transported by ambulance from Dr. Hanoka's office to Carle Clinic, where Dr. Jerome B. Kaufman performed surgery on his back.

Dr. Kaufman testified in an evidence deposition that he performed surgery on Mayol after he was taken to Carle Clinic on September 1, 1982. According to Dr. Kaufman, a ruptured disc caused Mayol's incapacitation on that date. To a reasonable degree of medical certainty, Dr. Hanoka's chiropractic manipulation caused this ruptured disc. Dr. Kaufman also testified that (1) manipulating the back of a patient who has a herniated disc is contraindicated, (2) Mayol "possibly" had a herniated disc while the two chiropractors were treating him, and (3) Dr. Forman's manipulation of Mayol might have caused some extrusion of disc material or worsened Mayol's condition.

Dr. Charles Bartoli, a chiropractor, also testified on behalf of Mayol. Dr. Bartoli stated that when a patient does not respond within two to four weeks to treatment that helped him in the past, a chiropractor has a responsibility to refer the patient elsewhere for treatment, to take X rays of the patient, or to have other tests performed

on the patient. According to Dr. Bartoli, Dr. Forman's failure to do any of these things with respect to Mayol after his condition did not improve fell below acceptable standards of chiropractic care. Also, Dr. Bartoli testified that the maneuver which Dr. Hanoka performed on Mayol on September 1, 1982, would have been contraindicated given Mayol's condition.

## D. *Evidence of Legal Malpractice*

Mayol testified that in October 1982, defendant Kimpel orally agreed to represent him in his chiropractic malpractice action for one-third of the recovery, with defendants paying the costs. Although Kimpel claimed that they entered into a written contract, Mayol asserted that he first heard of this written contract during Kimpel's discovery deposition in 1988. Mayol said he decided to hire Kimpel because, in part, of Kimpel's representations that he had tried malpractice cases to verdict.

At his first meeting with Kimpel, Mayol advised Kimpel that Dr. Hanoka had criticized Dr. Forman's treatment of him. With respect to deposing Hanoka, Kimpel told Mayol either " 'all in due time' " or " 'let the defendants pay for it.' " Defendants never deposed Dr. Hanoka. Mayol also advised Kimpel, verbally and in writing, that Dr. Forman had criticized Hanoka's care of him sometime in mid-February 1983, when Dr. Forman came to Mayol's office to talk with him about his lawsuit against Dr. Forman. Mayol stated that Kimpel never advised him that he was going to depose Dr. Forman with regard to his criticism of Hanoka.

In 1982, Kimpel told Mayol that Dr. Hoover agreed to testify as an expert that one or both of the chiropractors who treated Mayol deviated from the applicable standard of chiropractic care. However, close to the hearing on the chiropractors' motions for summary judgment, Dr. Hoover suffered a stroke and declined to testify. Thereafter, Kimpel told Mayol that Mayol should retain another expert if he knew of one. Mayol told Kimpel that he would try to get Drs. Paunicka and Matzner to review his records to see if he had a case.

Mayol called Drs. Paunicka and Matzner about a week before the June 4, 1986, summary judgment hearing. Dr. Paunicka told him that he did not want to get involved. Mayol advised Kimpel of this conversation before the summary judgment hearing.

Mayol contacted Dr. Matzner two to three days before the June 4, 1986, summary judgment hearing. Dr. Matzner agreed to review Mayol's records to determine if either chiropractor had committed malpractice, provided that Kimpel deliver the records to him. Mayol im-

mediately informed Kimpel of this development. On June 3, 1986, Dr. Matzner called Mayol, apologized, and said he could not review the records in depth on the basis of Dr. Forman's affidavit. Dr. Matzner repeatedly told Mayol that he did not have enough time and could not help Mayol.

Mayol testified that at a meeting between him and Kimpel at 7 a.m. on the morning of June 4, 1986, Kimpel said, " '[w]e have to go with what we have got unless we can go in with the opinion that a layman can draw his own conclusion that something went wrong in the office [of one of the chiropractors].' " According to Mayol, Kimpel said he would do just that. Kimpel never discussed with Mayol dismissing the case without prejudice or refiling it after dismissal without prejudice, nor did he explain that he could obtain a continuance to give Mayol more time to find an expert. Mayol testified that if Kimpel had told him he could dismiss his case without prejudice to avoid summary judgment and then refile within one year, he would have done so.

Kimpel never discussed seeking a continuance of the June 4, 1986, summary judgment hearing. Mayol stated he had no legal training, and at the time of the hearing on the summary judgment motions, he had only a general notion of what a motion for summary judgment or a motion for continuance was.

Mayol denied ever refusing to follow Kimpel's advice, ever refusing or failing to cooperate with Kimpel or any member of his firm in seeking expert witnesses, ever refusing to submit himself for examination to experts suggested by Kimpel, ever attempting to take over the management of his own case or direct his attorneys in opposition to their wishes or advice, ever telling defendants he did not wish to make further attempts to retain expert witnesses on his behalf to resist the motions for summary judgment, ever refusing to allow or authorize any of the defendants to retain experts, or ever refusing to pay for expert witnesses. Mayol stated he never refused to allow or authorize Kimpel or any member of his firm to file a motion for voluntary dismissal in order to gain additional time to obtain expert witnesses. According to Mayol, none of the defendants ever insisted on filing a motion for voluntary dismissal.

Attorney Robert C. Strodel testified for Mayol as a legal expert in personal injury litigation, with a subspecialty representing plaintiffs in medical malpractice. Strodel testified as follows: (1) if Kimpel had filed an affidavit or deposition of Dr. Kaufman concerning his opinion as to the cause of Mayol's ruptured disc in opposition to the chiropractors' motions for summary judgment, the trial court "more proba-

bly so than not" would not have granted summary judgment for the chiropractors; (2) if there was nothing else available to resist the motions for summary judgment, Kimpel deviated from the acceptable standard of care by failing to obtain Dr. Kaufman's deposition or at least to seek a continuance of the hearing on the motions for summary judgment in order to obtain that deposition; (3) the affidavits filed in support of the chiropractors' motions for summary judgment were subject to attack under Supreme Court Rule 191 (134 Ill. 2d R. 191); (4) a properly framed affidavit of either Dr. Matzner, Dr. Bartoli, or Dr. Kaufman "would have killed the summary judgment proceeding flat on its face"; (5) if Kimpel had properly presented Mayol's case against the chiropractors to a jury, there would have been better than a 50% chance of a verdict in Mayol's favor; (6) in view of the circumstances confronting defendants at the time of the June 4, 1986, hearing on the motions for summary judgment, Kimpel deviated from the acceptable standards of care by not first seeking a continuance or as a secondary remedy moving for voluntary dismissal; and (7) an attorney confronted with a motion for summary judgment who fails to depose two defendant chiropractors who the attorney knew had made comments critical of each other breaches of the standard of care applicable to an attorney under those circumstances.

On cross-examination, Strodel stated that he would request leave of court to withdraw from representation of a client who insisted that he not file a motion for voluntary dismissal after the court denied a continuance for the purpose of obtaining an expert witness.

Two legal experts testified on behalf of defendants. Attorneys Evan H. Johnson, whose practice includes defense of malpractice claims, and James Martinkus, whose practice includes a substantial number of medical malpractice, personal injury, and workers' compensation cases, both testified that defendants did not commit malpractice in representing Mayol. Although Johnson testified that an attorney should not obtain a voluntary dismissal of a lawsuit over the client's objection, he acknowledged on cross-examination that an attorney has a duty to advise his client of the option of a voluntary nonsuit if evidence cannot be gathered or obtained to resist a motion for summary judgment. Johnson also acknowledged that his opinions about Kimpel's handling of the case were essentially based on the facts as represented to him by Kimpel.

Martinkus admitted that he would normally have taken a deposition of the defendants in order to oppose a motion for summary judgment. Martinkus also stated that it is a deviation from the standard of care in a case such as Mayol's (1) to fail to take the deposition of a

chiropractor who might provide testimony that would successfully defeat the defendants' summary judgment motions, and (2) to fail to discuss with the client or recommend to the client voluntary dismissal without prejudice, when counsel did not then have but could later obtain an expert to resist the motions for summary judgment. Martinkus stated that with a hearing on summary judgment motions approaching, he would have deposed either of the two chiropractor-defendants, knowing they had expressed criticism of each other, provided he had nothing else in his file to oppose the summary judgment motions. Like attorney Johnson, Martinkus acknowledged that he based his opinions on what Kimpel told him.

Testifying on his own behalf, defendant Summers stated that he had handled some significant medical malpractice cases that eventually settled, but neither he nor his firm had tried a medical malpractice case to a verdict.

Testifying on his own behalf, Kimpel denied or attempted to controvert many of the crucial facts and allegations on which Mayol premised his legal malpractice claim. For instance, Kimpel stated that he examined the affidavits filed in support of the chiropractors' motions for summary judgment and determined that they were legally sufficient. Also, he opined that a deposition of Dr. Kaufman would not have helped to avoid summary judgment unless Dr. Kaufman "would have said he was a chiropractor and was within that specialty and could testify as to the standard of care and deviations therefrom." Furthermore, Kimpel believed his efforts to obtain expert testimony were within the standard of care required. On cross-examination, Kimpel testified that Mayol told him that he would never go to Dr. Drewes, a potential expert witness Kimpel had discussed using.

### E. *Evidence as to Damages*

Mayol testified that he could not walk immediately after the surgery on his back on September 2, 1982. He never felt as depressed as he did during the period of his hospitalization following the surgery, when he was learning to walk again. If he could have committed suicide, he would have. Mayol was discharged from the hospital on September 14, 1982. By late September or early October of that year, he could walk again. However, due to numbness in his feet, he still had problems walking on uneven surfaces. Mayol still experienced numbness in his hips, in both thighs, and on the outside of both of his feet. These conditions had not improved since approximately 1984.

Mayol also experienced complete and total loss of control over his bladder and bowels between September 1982 and sometime in 1984.

He also experienced a complete and total loss of sexual function between September 1982 and very early 1984. At the time of trial, he continued to experience some sexual dysfunction.

Mayol testified that he can no longer sit as many hours doing his accounting work as he did before the 1982 surgery. Mayol estimated that he lost $163,269 in earning capacity between 1982 and 1990, which he attributed to his injuries. He based that estimate on the difference between what he made and what he could reasonably have been expected to make from fees in his accounting business prior to his injuries. However, Mayol's total income did increase during this time period because he charged higher fees. The lost earnings figure did not include an adverse effect on the cash flow from Mayol's rental properties, caused by his inability to do repair and maintenance work as he had in the past.

As for the amount of damages Mayol could have received if victorious, attorney Strodel stated that Mayol's case against the chiropractors had a settlement value in the range of $200,000 to $350,000, and a maximum jury verdict value of $450,000 to $500,000. On cross-examination, Strodel stated in part the following with respect to the elements of damages on which he based his assessment of the value of Mayol's claim against the chiropractors:

> "My values in this case are based on the nature of the injury, what amounts to hellish pain and suffering as well as sexual dysfunction, problems of numbness and neurogenic bladder problems, all of which are just lovely."

Mayol testified that Kimpel had estimated the value of his case to be between $600,000 to $800,000.

The jury returned a verdict in favor of Mayol on his legal malpractice claim awarding $700,000 in damages, and also found for Mayol on Kimpel's counterclaim. The court entered judgment on this verdict and subsequently denied defendants' post-trial motion and their motion for remittitur.

## II. SUFFICIENCY OF THE EVIDENCE

### A. *Liability*

Defendants assert that we should reverse the judgment entered on the jury's verdict because (1) the verdict is contrary to the manifest weight of the evidence, and (2) the trial court should have entered a directed verdict in defendants' favor at the close of all of the evidence.

■ In order to recover damages for legal malpractice, a plaintiff must prove (1) the existence of an attorney-client relationship giving rise to a duty owed to the plaintiff by defendants, (2) a breach of that duty by defendant, (3) injuries to plaintiff which were proximately caused by the breach, and (4) damages resulting from the injuries. (*Nika v. Danz* (1990), 199 Ill. App. 3d 296, 308, 556 N.E.2d 873, 882; *Spivack, Shulman & Goldman v. Foremost Liquor Store, Inc.* (1984), 124 Ill. App. 3d 676, 683, 465 N.E.2d 500, 504.) An attorney commits actionable malpractice only if he or she fails to exercise a reasonable degree of care and skill. Whether an attorney has exercised a reasonable degree of care and skill is a question of fact. Conduct alleged to constitute legal malpractice must be measured against a standard of care that normally must be established by expert testimony. (*Spivack*, 124 Ill. App. 3d at 683, 465 N.E.2d at 505; see also *Jackson Jordan, Inc. v. Leydig, Voit & Mayer* (1990), 199 Ill. App. 3d 728, 732-33, 557 N.E.2d 525, 527.) An attorney's act or omission that is an error of judgment does not necessarily establish liability for malpractice. Malpractice liability may be imposed when the combined wisdom of the bar is that a reasonably competent attorney would not have exercised his or her judgment in that manner. *Gelsomino v. Gorov* (1986), 149 Ill. App. 3d 809, 814, 502 N.E.2d 264, 267.

A verdict is against the manifest weight of the evidence when the opposite conclusion is clearly evident, or when the findings of the jury are unreasonable, arbitrary, and not based on the evidence. (*Topp v. Logan* (1990), 197 Ill. App. 3d 285, 298, 554 N.E.2d 454, 463.) We conclude that the jury verdict in the present case is not contrary to the manifest weight of the evidence.

■ Defendants did not seriously dispute at trial that chiropractic malpractice occurred during the course of the chiropractors' treatment of Mayol. Whether legal malpractice occurred essentially depended on the jury's assessment of the credibility of the witnesses. Mayol alleged defendants committed various breaches of their duty of care in representing him, and in his testimony Kimpel attempted to provide justifications or explanations for some of these alleged breaches. In their testimony on direct examination, the parties' experts also provided differing opinions as to whether these acts and omissions constituted legal malpractice. Given the conflicting testimony, we do not find clearly evident a conclusion opposite that reached by the jury.

We further hold that the trial court did not err in denying defendants' motion for a directed verdict at the close of all of the evidence. A directed verdict should be granted only when the evidence, con-

strued most strongly in favor of the party against whom the motion is directed, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) The testimony of Mayol and of his experts, Dr. Bartoli and attorney Strodel, when construed most strongly in favor of Mayol, clearly favors Mayol's claim that defendants committed legal malpractice. We also note that even some of the cross-examination testimony of defendants' experts favors Mayol.

## B. *Damages*

Defendants assert that in view of Mayol's prior history of back trouble and traumatic incidents, the jury's $700,000 damage award is excessive. In support of this argument, defendants also state that there is no evidence of loss of income to Mayol.

In *Henry v. St. John's Hospital* (1987), 159 Ill. App. 3d 725, 734-35, 512 N.E.2d 1044, 1050, this court set forth the following principles applicable to determining whether a damages award is excessive:

> "The ascertainment and assessment of damages are questions of fact peculiarly within the province of the jury. Reviewing courts must be reluctant to interfere with the discretion of the jury, and the determination of damages will not be disturbed on appeal unless it is obviously the result of passion or prejudice, or is clearly excessive. An award is considered excessive if it falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock judicial conscience."

Mayol testified that Kimpel told him that his chiropractic malpractice case was worth around $600,000 to $800,000. The admissions of a party opponent are substantive evidence, and no preliminary foundation need be established in order for such statements to be admissible. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§802.1, 802.2, at 594, 597 (5th ed. 1990).) Mayol's testimony concerning Kimpel's admission, which the jury was entitled to believe, is in itself sufficient to sustain the jury's verdict. Furthermore, Mayol's expert witness, attorney Strodel, testified that the chiropractic malpractice claim had a maximum value of $450,000 to $500,000, based solely on pain and suffering and not including any claims for lost wages. Mayol testified that between 1982 and 1990, he suffered a $165,269 loss in earning capacity.

The sole case cited by defendants in which a damages award was held to be excessive, *Goertz v. Chicago & North Western Ry. Co.* (1958), 19 Ill. App. 2d 261, 273-74, 153 N.E.2d 486, 492-93, is distinguishable. In that case, there was no admission relevant to the amount of damages, and the plaintiff, who was 61 at the time he sustained injuries, was much older than the plaintiff in the present case, who was 42 years old at the time of trial.

## III. ALLEGED TRIAL ERRORS

### A. *Admission of Evidence*

Mayol called Kimpel as an adverse witness. In the course of Mayol's examination of Kimpel, the following exchange occurred:

"Q. [Plaintiff's counsel:] ***

In terms of your experience and expertise in this area of law, you had never tried or handled malpractice cases before had you?

A. [Kimpel:] No.

Q. You had handled some and settled some malpractice cases over 30 years, didn't you?

A. Yes."

Mayol's counsel then inquired:

"In fact at the time Mr. Mayol was a client at your firm and up to the present time, your expertise includes handling roughly two malpractice cases, does it not? That would be including the malpractice case against you in this case and the one against you by Emmett Joseph Tyler?"

The court sustained defendants' objection to this question and ordered Mayol, out of the hearing of the jurors, to refrain from indicating that someone else had brought another legal malpractice action against defendants. The court also denied defendants' motion for a mistrial.

Defendants contend that this reference to the Tyler malpractice suit against Kimpel was so highly prejudicial that the trial court should have declared a mistrial on the basis of this statement. We are unpersuaded.

■ The decision to declare a mistrial rests within the sound discretion of the trial court, whose exercise of discretion will not be disturbed on appeal absent a clear abuse thereof. (*Topp*, 197 Ill. App. 3d at 296, 554 N.E.2d at 462.) A mistrial should be granted only when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual preju-

dice as a result. (*Topp*, 197 Ill. App. 3d at 296, 554 N.E.2d at 462.) The question asked by Mayol's counsel falls short of meeting this standard. Accordingly, we conclude that the trial judge did not clearly abuse his discretion in not declaring a mistrial on the basis of Mayol's counsel's single reference to another legal malpractice action against defendant Kimpel.

■ Defendants also contend the trial court improperly admitted evidence that defendants had not paid Area Wide Court Reporting Service for a copy of Mayol's discovery deposition that was delivered to them. Defendants contend that Mayol's only purpose in presenting this evidence was to demean and prejudice them in the eyes of the jury and to portray them as deadbeats who did not pay their bills. Defendants assert that this evidence was not relevant to any of the issues in the case and should not have been admitted over their objections.

Evidence is relevant if it tends to prove or disprove a disputed fact or renders a matter in issue more or less probable. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 519, 468 N.E.2d 1228, 1235; *In re A.T.* (1990), 197 Ill. App. 3d 821, 833, 555 N.E.2d 402, 410.) We seriously doubt that the evidence concerning defendants' alleged nonpayment of a court reporter's fee has any relevance to the issue of whether defendants breached a duty of care in their representation of Mayol. (See *Goad v. Evans* (1989), 191 Ill. App. 3d 283, 302, 547 N.E.2d 690, 703.) However, we conclude that even if admission of this evidence was error, the error was harmless because the evidence in this case was not closely balanced and the error was an insignificant part of the trial. See *Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511, 524 N.E.2d 939, 944 ("A party is not entitled to reversal based on rulings on evidence unless the error was substantially prejudicial and affected the outcome of the trial").

## B. *Jury Instructions*

The trial court gave the jury the following instructions:

"There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule which provided that:

A lawyer shall not

violate a disciplinary rule; or engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

If you decide that a defendant violated the Supreme Court Rule on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evi-

dence in determining whether and to what extent, if any, the defendant was negligent or wilful, wanton or reckless at the time of the occurrence."

"There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule which provided that:

A lawyer shall not

(1) handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it;

(2) handle a legal matter without preparation adequate in the circumstances; or

(3) neglect a legal matter entrusted to him.

If you decide that a defendant violated the Supreme Court Rule on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, the defendant was negligent or wilful, wanton or reckless at the time of the occurrence."

Defendants contend that the trial court erred in giving the above instructions because attorney disciplinary rules do not delineate the bounds of civil liability for the conduct of attorneys and do not create private rights of action based on violations of them. We disagree.

■■ Juries in legal malpractice suits may properly consider standards of professional ethics pertaining to attorneys because such suits involve allegations of conduct that does not conform to minimum professional standards. (See *Rogers v. Robson, Masters, Ryan, Brumund & Belom* (1979), 74 Ill. App. 3d 467, 472-73, 392 N.E.2d 1365, 1371, *aff'd* (1980), 81 Ill. 2d 201, 407 N.E.2d 47.) Furthermore, it is well established that jury instructions may quote portions of statutes and ordinances where (1) the jury has heard evidence that defendant has violated the quoted portions of the statute or ordinance, and (2) plaintiff alleges the violation breached a duty owed to him by defendant. (See *Harris v. Day* (1983), 115 Ill. App. 3d 762, 772-73, 451 N.E.2d 262, 267-68; Illinois Pattern Jury Instructions, Civil, No. 60.01 (3d ed. 1991).) Like most statutes and ordinances, attorney disciplinary rules establish minimum standards of conduct and are intended to protect the general public. For these reasons, we hold that jury instructions may quote attorney disciplinary rules in legal malpractice cases to the same extent as they may quote statutes and ordinances in instructions in other types of negligence cases.

Defendants also take issue with certain other instructions the trial court gave to the jury, the first of which read as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule which provided that:

Supreme Court Rule 191

(a) Requirements. Affidavits in support of and in opposition to a motion for summary judgment ... shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto...

(b) When Material Facts Are Not Obtainable by Affidavit. If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons who [sic] affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order which may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtain [sic], or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing papers or documents in the possession of those persons or furnishing sworn copies thereof. The interrogatories and sworn answers thereto, depositions to [sic] taken, and sworn copies of papers and documents so furnished, shall be considered with the affidavits in passing upon motion [sic].

If you decide that a defendant violated the Supreme Court Rule on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, the defendant was negligent or wilful, wanton or reckless at the time of the occurrence."

The second instruction of which defendants complain stated the following:

"The Plaintiff's complaint consists of two counts. The issues to be decided by you under Count I of the complaint are as follows:

The plaintiff claims that he was injured and sustained damage and that the defendants were negligent in one or more of the following respects:

* * *

(h) In failing to prepare and file an affidavit under Supreme Court Rule 191 and seek such further continuances of the hearing on defendants' motions for summary judgment as was necessary in order to enable the retention of a qualified expert witness.

* * *

The plaintiff further claims that one or more of the foregoing was a proximate cause of his injuries.

The defendants deny that they were negligent in doing any of the things claimed by the plaintiff and deny that any claimed act or omission on the defendants' part was a proximate cause of the plaintiff's claimed injuries.

The defendants further deny that the plaintiff was injured or sustained damages."

Defendants argue that the trial court erred in giving the instruction quoting Rule 191 (134 Ill. 2d R. 191) because the jury could not understand or determine how to apply the rule due to its highly technical nature.

■ If, as defendants contend, Supreme Court Rule 191 might appear "highly technical" to some jurors, defendants should have tendered an instruction clarifying the rule's meaning. Not having done so, defendants cannot now complain about any confusion that the instruction setting forth portions of Rule 191 might have caused the jury. See *Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 451, 461 N.E.2d 64, 71.

■ Finally, defendants argue that there was no basis for count II of Mayol's complaint, alleging that various omissions and inactions on the part of defendants amounted to "willful, wanton or reckless" conduct. Defendants assert that any shortcomings in their representation of Mayol constituted mere differences in opinion and judgment concerning trial tactics, which fell far short of wilful and wanton or reckless conduct. Defendants thus argue that having a wilful and wanton count in this case severely prejudiced them, as shown by the large size of the jury's verdict. Defendants argue that because there was no evidence of wilful and wanton conduct on their part, the trial court's

instructing the jury as to this count requires either outright reversal of the verdict in Mayol's favor or a new trial.

As previously indicated, the jury's verdict on Mayol's legal malpractice claim falls within the range of damages suggested by the evidence presented at trial. Furthermore, the trial court did not instruct the jury that a finding of wilful and wanton or reckless conduct would provide a basis for an award of punitive damages. For these reasons, we cannot conclude that instructing the jury as to count II of Mayol's complaint materially affected the size of the jury's verdict. Therefore, any error was harmless. *Cairns*, 170 Ill. App. 3d at 511, 524 N.E.2d at 944.

The judgment of the circuit court of Champaign County is affirmed.

Affirmed.

KNECHT and LUND, JJ., concur.