2025 IL App (1st) 241379-U

No. 1-24-1379

First Division
September 22, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| CHARLES SOUKUP, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 21 L 8245 |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD | ) | |
| CORPORATION, d/b/a METRA, | ) | Honorable |
| | ) | Robert Harris, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion either in barring admission of certain safety regulations at trial nor in refusing to instruct the jury on the safety regulations where the regulations were not applicable or relevant to the facts of the case.

¶ 2    Plaintiff-appellant Charles Soukup, an employee of defendant-appellee Northeast Illinois Regional Commuter Railroad Corporation, doing business as Metra, brought a claim against Metra under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2020)) for injuries he

sustained while exiting the rear compartment of his Metra-assigned work truck. The action proceeded to a jury trial and concluded with a verdict and final judgment in favor of Metra. Soukup now appeals from the final judgment, arguing that the trial court erred in barring the admission of railroad motor vehicle safety regulations of the Illinois Commerce Commission (ICC) and in failing to instruct the jury as to the same regulations. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      On October 17, 2018, Soukup was employed by Metra as a traveling janitor. He arrived at the Robbins Metra train station at 13890 South Kedzie Avenue in Chicago, Illinois, to clean and service the depot and injured himself while exiting the back of his assigned work truck.

¶ 5      On August 17, 2021, Soukup filed this lawsuit against Metra. On November 1, 2021, Soukup filed an amended complaint, alleging that Metra was negligent by, *inter alia*, failing to provide a reasonably safe place to work, violating certain safety standards, failing to provide a reasonably safe work truck with a safe means of egress, and that Metra's negligence caused Soukup's injuries. On November 29, 2021, Metra filed its answer, as well as an affirmative defense of contributory negligence.

¶ 6      The jury trial commenced on January 16, 2024. Prior to trial, on that same day, the trial court heard arguments on the parties' various motions *in limine*. Relevant here, Metra's motion *in limine* No. 40 and Soukup's motion *in limine* No. 34 addressed the ICC's rail carrier motor vehicle safety regulations, specifically section 1550.30, which Soukup had referenced in a prior motion before the court. Soukup requested that the trial court find that the ICC safety regulations are safety statutes under FELA, citing *Fletcher v. Chicago Rail Link, LLC*, 568 F.3d 638 (7th Cir. 2009). In contrast, Metra argued that section 1550.30 is applicable only to "trucks that have been *converted for employee transportation*, not for trucks that are used to store equipment and materials" and

thus the ICC regulations have no bearing on Soukup's negligence claim. (Emphasis in original.) On January 19, 2024, the trial court entered an order, denying Soukup's motion *in limine* and granting Metra's motion *in limine*, barring any evidence of the ICC motor vehicle safety regulations.

¶ 7     The following witnesses provided testimony at trial: Soukup; Soukup's Metra supervisor, Luis Diaz; another Metra employee, Beverly Rutledge; and Soukup's treating orthopedic surgeons, Dr. Scott Price and Dr. Brian Cole, whose testimony was presented via video evidence depositions. As the facts of this case are largely not in dispute on appeal, we provide the following summary of the evidence presented at trial.

¶ 8     On October 17, 2018, Soukup arrived at the Robbins train station and entered the back of his assigned work truck to retrieve a safety cone. Soukup's truck, which he had been regularly driving for about two years, was a Ford 150 pickup with a large lockable storage cap secured in the pickup bed.[1] The cap was accessible via double rear doors with windows in each one, and it offered smaller storage compartments set into its outside walls. Soukup stored mops, brooms, dust pans, and other cleaning supplies in the storage cap. Although some Metra work trucks had a designated location to store the safety cone, Soukup's truck did not, and he kept it in the storage cap. Pursuant to Metra policy, employees are required to place a safety cone behind the work truck when parked anywhere other than a Metra-designated parking spot. The Metra policy did not specify where the cone should be stored.

---

[1]We recognize that the parties use different terms to describe this component of the truck. Throughout this decision, we refer to it as a storage cap, rather than "rear compartment" as Soukup would prefer, so as not to conflate our generic description with the ICC's legal definition of "rear compartment."



¶ 9     In exiting the back of the truck, Soukup placed one hand on the safety cone for support and the other hand on the inside wall of the truck's storage cap and stepped down to the ground. Soukup testified that there are no hand holds at the rear of the truck; he preferred not to use the small, narrow step at the rear of the truck below the license plate to step down; and he could not place his hands near the door jambs because that would be a violation of a Metra rule. He further testified that, when he stepped down, he landed harder than he intended and, once his right leg hit the ground, he felt "severe pain coming out of [his] knee" and fell to the ground. Soukup was able to retrieve his phone, and he called Metra's emergency phone number. Metra police and an ambulance arrived at the scene and took Soukup to MetroSouth Medical Center in Blue Island.

¶ 10     At the hospital, it was determined that Soukup had a severe knee injury. He was given a brace and informed that he would need to see a specialist. One of Soukup's coworkers retrieved him from the hospital and transported him back to the Metra office, where he completed an incident form. Therein, he stated that he retrieved the safety cone, stepped out of the truck, and injured his knee. In that statement, he made no claim that there was an issue with the truck.

¶ 11     Immediately following Soukup's injury, Diaz, a bridge and building supervisor for Metra and the designated representative for Metra in this lawsuit, submitted a report to Metra regarding the incident. That report stated that Soukup's knee gave out when he stepped out of the truck and he fell to the ground. Based on that report, Metra instructed Diaz to create a reenactment of the incident, which was video recorded in October 2018, not long after Soukup was injured. Diaz did not review Soukup's incident report until after the reenactment was completed.

¶ 12     Rutledge, another Metra employee, participated in the October 2018 reenactment video, which was played for the jury. She testified that when exiting the truck, she would place her hand at the top of the truck where the doors close. She was not aware of Metra's rule against placing hands near the edge of the door or door jambs. She testified that that is the manner by which she has exited that truck for years, and she has never been injured nor felt unsafe. Diaz expressed no criticisms of Rutledge's reenactment of exiting the back of the truck.

¶ 13     On May 31, 2023, a Metra truck investigation was conducted, and another reenactment was recorded, this time with Diaz entering and exiting the truck. This second video was also played for the jury. Diaz testified that there are no hand holds and to get in and out of the truck he would place a foot on a small step near the license plate, place his hands on "a little lip inside the door" near the door hinges, and place his other foot on the step as well before stepping to the ground. Diaz admitted that he and Rutledge had slightly different methods for exiting the truck, but both exited backwards and utilized the small step by the license plate. Diaz testified that he was not familiar with any Metra rule to keep your hands off of doors and door frames on the trucks. On cross-examination, Diaz clarified that the rule regarding where not to place your hands related to train cars, not trucks or other motor vehicles. Diaz also testified that the employees were not specifically trained on how to exit the back of the truck because "it's a basic thing" and "common

sense" how to get in and out of a small truck. Finally, he testified that, in his 36 years of employment with Metra, no one had ever complained about the lack of hand holds at the back of these trucks.

¶ 14 Following the incident, on October 22, 2018, Soukup first visited Dr. Price, who diagnosed him with tears of the right knee's anterior cruciate ligament (ACL) and medial collateral ligament (MCL). Soukup was advised to rest his knee for six weeks as conservative treatment. On December 20, 2018, Dr. Price performed surgery on Soukup's knee for a full reconstruction of the ACL and a repair of the MCL. On January 20, 2020, Soukup returned to Dr. Price, complaining of instability of the knee, and Dr. Price determined that the reconstructive surgeries had failed. Subsequently, Soukup visited Dr. Cole for a second opinion. Dr. Cole recommended revision surgery, which was delayed by several months due to the COVID-19 pandemic. Dr. Cole eventually performed the revision surgery on August 4, 2021. Soukup returned to work in November 2021.

¶ 15 Soukup tendered jury instruction no. 19, which recited section 1550.40 of the ICC motor vehicle safety regulations and was modeled after Illinois Pattern Jury Instructions, Civil, (2011) No. 60.01 (hereinafter IPI Civil (2000) No. 60.01), The proposed instruction provided as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a certain administrative regulation which provided that:

Ill. Admin Code tit. 92 § 1550.40

Current through Register Vol. 48, No. 1, January 5, 2024

Section 1550.40 – Inspection, Testing and Repairs

a) All vehicles shall be kept in good repair and safe operating condition at all times, and unsafe vehicles shall not be used to transport employees.

b) Vehicles shall be regularly inspected and tested.

c) Compartments for employees shall be kept in a clean and sanitary condition, and employees shall cooperate in maintaining such conditions.

If you decide that the defendant violated the regulation on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, the defendant was negligent before and at the time of the occurrence."

The trial court rejected this instruction, and it was not provided to the jury.

¶ 16 On January 19, 2024, the jury returned a verdict in favor of Metra, and judgment on the jury's verdict was entered on the same day. On February 8, 2024, Soukup filed a motion for a new trial, arguing that the court should not have barred the admission of the ICC regulations nor refused to instruct the jury on the ICC regulations. On June 14, 2024, the trial court denied Soukup's motion.

¶ 17 This appeal followed.

¶ 18                                    II. ANALYSIS

¶ 19 On appeal, Soukup argues that the trial court erred in barring the admission of railroad truck safety regulations and in failing to instruct the jury as to the railroad truck safety regulations.

¶ 20 Both of Soukup's challenges on appeal are subject to the same standard of review. First, because a trial court has broad discretion over the admission of evidence, its decision on a motion *in limine* will not be disturbed absent an abuse of discretion. *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 66. Second, a trial court's decision to grant or deny a jury instruction is also reviewed for abuse of discretion. *Bailey v. Mercy Hospital & Medical*

*Center*, 2021 IL 126748, ¶ 42. "An abuse of discretion occurs when the court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would adopt the court's view." *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28.

¶ 21    The resolution of both claims depends on the applicability of the motor vehicle safety regulations in Part 1550 to the circumstances in this case. Soukup contends that the safety regulations enacted by the ICC applied to the Metra truck involved in his injury, and the trial court erred by refusing to permit the jury to consider these safety regulations in their deliberations. Throughout his brief, Soukup cites a number of decisions from other jurisdictions to support his contention that the ICC safety regulations were to be considered safety statutes under FELA. However, that is not the issue now before us, and we therefore have no cause to contest the correctness of those decisions. The dispute to be resolved here is whether the cited regulations are applicable and relevant to the facts and circumstances of this case. If they are not applicable, then they were properly excluded from presentation to the jury as evidence and also as a part of the jury instructions, regardless of their status under FELA. See *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 293 (2008) (where it was determined that because the OSHA regulation did not apply to the facts of the case, it was unnecessary to determine whether OSHA was a safety statute under FELA). For the following reasons, we conclude that the cited safety regulations are not applicable here and the trial court did not abuse its discretion in barring their admission as evidence at trial or in denying Soukup's jury instruction containing the same.

¶ 22    It is undisputed that Soukup's employment as a traveling janitor required his use of a Metra-provided truck to travel to various Metra stations and to store his cleaning equipment. Soukup stated that he had been driving the same truck for at least two years prior to his injury. As we previously described, the truck was a Ford 150 pickup truck with a large lockable storage cap

secured in the pickup bed. The cap was accessible via double rear doors, and it offered smaller storage compartments set into its outside walls. Other than windows on the rear doors, there were no other windows on the storage cap. Soukup kept mops, brooms, dust pans, other cleaning supplies, and a safety cone in the storage cap.

¶ 23    Necessary to our analysis is an examination of the ICC motor vehicle safety regulations to determine whether those regulations are relevant and applicable to the vehicle and the circumstances at issue here. Administrative regulations have the force and effect of law and, as such, must be construed under the same principles governing the interpretation of statutes. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008). "In interpreting an agency regulation, our primary objective is to ascertain and give effect to the intent of the agency[.]" *Id.* The plain language of the regulation is the most reliable indicator of the legislature's intent, and we must consider the regulation in its entirety in determining the plain meaning. *Id.* Further, words and phrases must be interpreted in light of other relevant administrative regulations, rather than in isolation. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). "Where the language of the regulation is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction." *Madigan*, 231 Ill. 2d at 380. Although the standard of review for the trial court's evidentiary and jury instruction rulings is abuse of discretion, the interpretation of administrative regulations is reviewed *de novo*. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16. This standard of review is particularly appropriate here because the underlying facts necessary to determine the applicability of the regulations are not in dispute. *Schultz*, 201 Ill. 2d at 288.

¶ 24    The ICC regulations germane to this case are found in the "Rail Carriers" title, specifically in Part 1550 entitled "Motor Vehicles Used by Common Carriers by Rail to Transport Employees

to and from Their Places of Employment or During the Course of Their Employment." 92 Ill. Adm. Code 1550. Although Soukup only referenced sections 1550.30 and 1550.40, we set forth below a number of relevant regulations in the order found in Part 1550.

¶ 25    Section 1550.10, titled "Purpose, Scope and Application," provides that this part of the Rail Carriers title prescribes "regulations establishing minimum standards for the safe transportation of employees to and from their places of employment and during the course of their employment." 92 Ill. Adm. Code 1550.10(a) (2025).

¶ 26    Section 1550.20 contains definitions for Part 1550. Relevant here, "rear compartment" is defined as: "A crew cab, which may be a continuation of the driver's cab, providing additional seating capacity, or an auxiliary cab located directly behind the driver's cab." *Id.* § 1550.20. However, "rear compartment" is even further defined in section 1550.30. Paragraph (a) states that a rear compartment may be either a continuation cab or an auxiliary cab. *Id.* § 1550.30(a). Paragraph (b) defines a continuation cab as "a standard crew cab as designed and furnished by the motor vehicle manufacturer or as constructed by a motor vehicle body company which is a continuance of the driver's cab" and "[i]n this type of cab, no communication system between the rear compartment and the driver is required." *Id.* § 1550.30(b). Paragraph (c) provides the following definition for an auxiliary cab:

> "An auxiliary cab is a rear compartment separated from the driver's cab. It shall be of metal construction (including top), welded or riveted, with interior lining, equipped with adequate padded seats and back rests firmly secured in place. It shall be fastened directly to the frame of the motor vehicle and not to the surface of the bed of the vehicle. When necessary, it shall be equipped with steps and hand holds. Communication between this type of cab and the driver may be in the form of a light mounted on the instrument panel

or an audible device that can be operated by the employees riding in the rear compartment. An intercommunication system for actual voice contact may also be used. Communication systems must be kept in good working condition at all times." *Id.* § 1550.30(c). Referring to both types of rear compartments, paragraph (d) provides that they "shall be provided with a heating system for cold weather and a ventilation system for hot weather" and "[w]here a compartment is equipped with only one door, at least one window shall be of the 'knock-out' type and of sufficient size to provide emergency exit for the employees." *Id.* § 1550.30(d).

¶ 27    Section 1550.40, which was included in the jury instruction at issue, provides that "[a]ll vehicles shall be kept in good repair and safe operating condition at all times" and "[v]ehicles shall be regularly inspected and tested." *Id.* § 1550.40(a), (b).

¶ 28    Finally, paragraph (k) of section 1550.60 provides that "[a]ny hazardous condition or defect of a motor vehicle or unsafe practice of the driver or employees riding in vehicles used to transport employees shall be reported in writing to the employer or supervisor as soon as possible by any employee having knowledge of such conditions." *Id.* § 1550.60(k).

¶ 29    Soukup argues that Part 1550 of the Rail Carriers title is applicable to the circumstances here because he was using the assigned Metra truck to transport himself (and his equipment) to various Metra stations as part of his employment with Metra. We agree. Despite Metra's urging to the contrary, there is nothing in any of the sections explicitly stating that the regulations are only applicable where multiple employees are being transported. Although several of the regulations contemplate the additional safety concerns involved when transporting more than one individual, *i.e.* someone other than the driver, the clear intention of this chapter is to ensure the safety of employees while traveling in motor vehicles furnished by rail carriers. Thus, Soukup's transportation of himself falls within the plain meaning and clear intention of Part 1550.

¶ 30    However, that is the only aspect of Soukup's argument with which we agree. Soukup argues that section 1550.30(c), which provides that "[w]hen necessary, it shall be equipped with steps and hand holds[,]" applied to the area of Soukup's truck in which he stored his equipment, and therefore, Metra violated section 1550.30 by failing to provide hand holds near the doors, resulting in his injury. We disagree with this interpretation and find that Soukup has erroneously taken this sentence of the regulation out of context. The reasonable meaning of each word, clause, or sentence "cannot be determined in isolation but, rather, must be drawn from its context." *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2019 IL App (1st) 180697, ¶ 36.

¶ 31    When read as a whole, we construe the safety regulations related to rear compartments to apply exclusively to areas of a motor vehicle utilized for additional passenger seating. In the section titled, "Rear Compartments[,]" paragraph (a) provides that there are two categories of rear compartments: continuation cabs and auxiliary cabs. 92 Ill. Adm. Code 1550.30(a). Paragraph (b) defines a continuation cab as "a standard crew cab as designed and furnished by the motor vehicle manufacturer or as constructed by a motor vehicle body company which is a continuance of the driver's cab." *Id.* § 1550.30(b). The storage cap at issue here could not be considered a continuation cab as it is not connected to the driver's cab.

¶ 32    Soukup contends instead that the storage cap is an auxiliary cab, which is defined and regulated in paragraph (c). That paragraph provides that an auxiliary cab is separated from the driver's cab and should be of "metal construction (including top), welded or riveted," which appears true of the storage cap here. *Id.* § 1550.30(c). The paragraph continues, however, that the cab "*shall* be *** equipped with adequate padded seats and back rests firmly secured in place." (Emphasis added.) *Id.* There is no dispute that the storage cap here does not have any seats or back rests, which, based on the use of the word "shall," is clearly a requirement for an auxiliary cab.

Most relevant here, the paragraph next states that, "[w]hen necessary, it shall be equipped with steps and hand holds." *Id.* Notably, this requirement appears discretionary depending upon the specific configuration of the auxiliary cab. Nonetheless, this sentence seems to make sense only within the context of the additional passengers who presumably would be utilizing the padded seats, as insinuated by the previous sentence. Finally, the paragraph provides various requirements for a communication system in the auxiliary cab allowing the driver and the passengers in the auxiliary cab to communicate with one another. *Id.* § 1550.30(d). Again, there is no dispute that the storage cap here did not have the necessary communication system, which makes sense as only cleaning supplies were carried in truck. There was no one in the truck with whom it was necessary for Soukup to communicate.

¶ 33     Nothing about paragraph (c) is ambiguous, and, giving the words their plain and ordinary meaning, it is clear that an auxiliary cab refers *only* to a component of a motor vehicle serving the specific purpose of accommodating additional passengers in transit. Significantly, paragraph (d) also requires that both types of rear compartments have a "heating system for cold weather and a ventilation system for hot weather[,]" with which Soukup's storage cap did not comply and which lends further credence to our conclusion that section 1550.30 only applies to areas for additional passengers. A finding that the "hand hold" sentence in paragraph (c) is related to anything other than the safe transport of *additional* passengers would be a gross misreading of the regulations for rear compartments. In conclusion, the part of the truck which Soukup contends should have had hand holds did not have additional seating and was therefore not an auxiliary cab. Thus, section 1550.30 does not apply to the circumstances here.

¶ 34     Nonetheless, Soukup argues, pursuant to the definition of "rear compartment" in section 1550.20, that the regulations do not require an auxiliary cab to provide additional seating, and thus,

the sentence on hand holds applies equally to his storage cap. Specifically, the definition provides that a rear compartment is a "crew cab, which may be a continuation of the driver's cab, providing additional seating capacity, or an auxiliary cab located directly behind the driver's cab." *Id.* § 1550.20. According to Soukup, the "additional seating capacity" language does not apply to auxiliary cabs because the subsequent use of the disjunctive "or" results in that phrase exclusively modifying the former clause. However, as explained above, the subsequent section makes clear that there are two types of rear compartments for purposes of Part 1550: continuation cabs and auxiliary cabs. See *id.* § 1550.30(a). When considering these two distinct categories of cabs, section 1550.20's definition must mean that all rear compartments are crew cabs, and crew cabs can be either continuation cabs or auxiliary cabs. The Merriam-Webster Online Dictionary defines "crew" as "a group of people associated together in a common activity or by common traits or interests" or "a company of people working on one job or under one foreman or operating a machine." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/crew (last visited Sept. 3, 2025). Therefore, notwithstanding the specious placement of the "additional seating capacity" phrase, all rear compartments as contemplated by the ICC must provide seating for a group of people, or a crew as it were. This interpretation of the rear compartment definition in section 1550.20 also comports with our interpretation of section 1550.30 above.

¶ 35    Moreover, keeping in mind that the purpose of Part 1550 is to provide for the safe transportation of employees, it would be illogical to presume that the regulations would apply equally to non-passenger areas of motor vehicles. See *Madigan*, 231 Ill. 2d at 380 (stating that courts must remain mindful of the subject a regulation addresses and the apparent intent of the agency in enacting it). It is unlikely that the ICC was concerned with the safety of the equipment

in a storage cap where no employees would be seated. Similarly, the ingress and egress of employees who are *not* being transported in that storage cap would not be within the purview of regulations promulgated for the safe transportation of employees. Thus, it is clear that the requirements for rear compartments in section 1550.30 only apply to areas utilized for additional passengers, not for storage caps such as the one equipped on the truck at issue. As such, the trial court did not abuse its discretion in refusing to admit evidence of section 1550.30 at trial where it was not relevant or applicable to the circumstances of the case. See *Schultz*, 201 Ill. 2d at 286-93 (the trial court properly barred reference to OSHA regulations that did not apply to the facts of the case); *Ruffiner v. Material Service Corp.*, 116 Ill. 2d 53, 58 (1987) (evidence of industry standards were not admissible where the supreme court found that industry standards regarding ladders were not relevant to the circumstances of the case as the ladder involved was not the type controlled by the standard). We now turn to the trial court's ruling on Soukup's jury instruction no. 19.

¶ 36    Soukup's proposed jury instruction no. 19 quoted section 1550.40, which mandates the inspection and testing of vehicles for transportation and that such vehicles be kept in good repair and safe operating condition. His instruction was modeled on IPI Civil (2011) No. 60.01. "A trial court is required to use an Illinois Pattern Jury Instruction when it is applicable in a civil case after giving due consideration to the facts and the prevailing law[.]" *Schultz*, 201 Ill. 2d at 273. The "Notes on Use" commentary with respect to this instruction states that it should only be given "where the evidence would support a finding that the injury complained of was proximately caused by violation of *** [an] administrative regulation intended to protect against such an injury, and that the injured party is within the class intended to be protected by the *** administrative regulation." IPI Civil (2011) No. 60.01, Notes on Use. Further, "it is well established that jury instructions may quote portions of statutes or ordinances where (1) the jury has heard evidence

that defendant has violated the quoted portions of the statute or ordinance, and (2) plaintiff alleges the violation breached a duty owed to him by defendant." *Mayol v. Summers, Watson & Kimpel*, 223 Ill. App. 3d 794, 810 (1992).

¶ 37 Here, because the safety regulation regarding hand holds was not applicable to Soukup's truck, there could be no violation thereof. Additionally, section 1550.60(k) requires employees to report hazardous conditions or defects; however, there was no testimony that Metra was aware of any defect with Soukup's truck. Rather, Diaz testified that he had never received a complaint about the lack of hand holds on trucks like Soukup's, and Soukup testified that he never complained about his truck prior to his injury. Because the evidence presented in this case did not support a violation of any safety regulations nor did the evidence demonstrate any known hazardous condition, there was nothing to support the giving of Soukup's proposed instruction. See *Bell v. Hill*, 271 Ill. App. 3d 224, 230 (1995) (finding that denial of the instruction was not error where the evidence did not implicate the statute); see also *Parsons v. Norfolk Southern Railway Company*, 2017 IL App (1st) 161384, ¶ 51 (finding no error in the giving of the instruction containing an ICC regulation where the plaintiff submitted evidence that the regulation applied and the defendant violated the regulation). We have also already concluded that the trial court properly denied the admission of section 1550.30 into evidence. Thus, had this jury instruction been given, the jury would likely have been confused as they had never heard any evidence regarding these safety regulations during the trial. See *Schultz*, 201 Ill. 2d at 280 ("Jury instructions should not be misleading or confusing."). Therefore, the trial court did not abuse its discretion in rejecting Soukup's proposed instruction no. 19. See *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995) (stating that it is within the trial court's discretion to determine what issues have been raised by the evidence).

¶ 38    Finally, we address *Fletcher v. Chicago Rail Link, LLC*, 568 F.3d 638 (7th Cir. 2009), upon which Soukup heavily relies for support of his argument. Specifically, Soukup contends that, in *Fletcher*, the Seventh Circuit agreed that "the ICC regulations apply to trucks used to transport materials around the rail yard." Soukup further asserts that if we affirm the trial court, "then injured workers filing in Illinois state court will not be able to introduce the regulations" and "would disrupt the uniformity of law." We note that the *Fletcher* decision involved the narrow issue of whether these regulations should be considered safety statutes under FELA's contributory negligence limitation. Nonetheless, in the interest of fully addressing Soukup's argument, we discuss its applicability to the specific issue before this court.

¶ 39    In *Fletcher*, 568 F.3d at 638, a railroad employee whose job entailed driving a utility vehicle to transport equipment was injured in a collision with another vehicle. The employee claimed that the accident was caused by the railroad's failure to maintain the SUV in a safe condition or the failure to warn him that it was unsafe. *Id.* The jury awarded the employee $700,000 and found him 50% contributorily negligent. *Id.* The trial court found that the railroad violated section 1550.40 because it had notice of the issue with the vehicle's brakes, and therefore the contributory negligence finding was vacated. *Id.* at 638-39. On appeal, the Seventh Circuit reversed the trial court's decision to vacate the contributory negligence, finding that the state regulations were not sufficiently related to federal regulations to be considered safety statutes under FELA. *Id.* at 639-40. The Seventh Circuit did not remark upon the admissibility of the safety regulations in Part 1550.

¶ 40    Although portions of Part 1550 were admitted into evidence and included in the jury instructions in *Fletcher*, that does not mean that the same should have been presented to the jury in the case before us. We recognize that the facts of *Fletcher* suggest that, like in the case before

us, the employee was traveling alone in a railroad-assigned vehicle, arguably furnished for the purpose of transporting employees (and equipment) to and from worksites. However, further review of other filings in that case reveal that the employee was driving a 1996 GMC "Carryall," a sports utility vehicle, which has multiple rows of seating and does not have a truck bed. There is nothing in the filings indicating that the vehicle was outfitted with a rear compartment or storage cap of any sort, and the issue with the vehicle in *Fletcher* was that the brakes failed, which was previously reported as a problem by other employees. As such, there was likely no debate in the trial court as to whether the requirements for rear compartments applied to the circumstances, whereas, here, that is precisely the sole argument before us. Additionally, we point out that there was a known defect in *Fletcher*, whereas here the testimony at trial was that no employee had previously complained of the lack of hand holds for ingress and egress from the storage cap. For this reason, we do not find *Fletcher* analogous to the instant case. Further, because our decision is specific to the facts of the case before us, it does nothing to bar future injured employees from using these safety regulations to support claims of negligence where the circumstances support their applicability.

¶ 41 Because the vehicle involved in this case did not have a rear compartment as contemplated in Part 1550 of the ICC regulations, we conclude that the trial court did not abuse its discretion in refusing to admit the regulations into evidence or in denying Soukup's jury instruction involving these regulations.

¶ 42                                  III. CONCLUSION

¶ 43 For the reasons stated, we affirm the judgment of the circuit court.

¶ 44 Affirmed.